IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MARIA M. OCASIO-ALVARADO,

    Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of
the Social Security Administration,

    Defendant.

Civil No. 10-1436 (BJM)

## OPINION AND ORDER

Plaintiff Maria M. Ocasio-Alvarado ("Ocasio") filed a complaint seeking judicial review of the decision of the defendant, Michael J. Astrue, Commissioner of the Social Security Administration ("Commissioner"), finding that she was not disabled prior to June 30, 2005, under Sections 216(i) and 223(d) of the Social Security Act, 42 U.S.C. §§ 416(i) and 423. (Docket No. 1). Ocasio filed a memorandum of law in support of her position. (Docket No. 10). She asks for judgment reversing the determination of the Commissioner, or, in the alternative, vacating the Commissioner's decision and remanding for further proceedings. (Id.). The defendant answered the complaint and filed a memorandum of law. (Docket Nos. 7, 20). The parties consented to have the case heard before me. (Docket Nos. 13, 17). After careful review, the Comissioner's decision is affirmed.

## LEGAL STANDARD

The court's review is limited to determining whether the Administrative Law Judge ("ALJ") employed the proper legal standards and found facts upon the proper quantum of evidence. Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996). The ALJ's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991); Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24,

**Maria M. Ocasio-Alvarado v Commissioner of Social Security**                        Page 2
CIVIL NO. 10-1436 (BJM)
**OPINION AND ORDER**

26 (1st Cir. 1986). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodríguez Pagán v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). The burden is on the claimant to prove that he is disabled within the meaning of the Social Security Act ("Act"). See Bowen v. Yuckert, 482 U.S. 137, 146-47 n.5 (1987). A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[1] 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

     A five-step sequential evaluation process must be applied to every case in making a final determination as to whether a claimant is disabled. 20 C.F.R. §404.1520; see also Bowen, at 140-42; Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982). In step one, the ALJ determines whether the claimant is engaged in substantial gainful activity. If she is, disability benefits are denied. 20 C.F.R. § 404.1520(b). If she is not, the ALJ proceeds to step two, through which it is determined whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. However, if the impairment or combination of impairments is severe, the evaluation proceeds to the third step, in which it is determined whether the claimant has an impairment equivalent to a specific list of impairments

---

[1] The phrase "work which exists in the national economy" means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step, through which the ALJ determines whether the impairment prevents the claimant from performing the work she has performed in the past. If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e). If it is determined that the claimant cannot perform this work, then the fifth and final step of the process calls for a determination of whether the claimant is able to perform other work in the national economy in view of the residual functional capacity ("RFC"), as well as age, education, and work experience. If the claimant cannot perform other work in the national economy, then she is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

The claimant has the burden, under steps one through four, of proving that she cannot return to her former employment because of the alleged disability. Santiago v. Sec'y of Health & Human Servs., 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has demonstrated a severe impairment that prohibits return to her previous employment, the Commissioner has the burden, under step five, to prove the existence of other jobs in the national economy that the claimant can perform. Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989).

**FACTUAL AND PROCEDURAL BACKGROUND**

Ocasio is now forty-four years old. (Transcript [Tr.] 60). She completed high school and cosmetology training. (Tr. 113). She previously worked as a fast-food employee, as well as a cafeteria cook, cleaner, and cashier. (Tr. 110). She initially claimed disability beginning August 9, 2001, at age thirty-three, due to anxiety attacks, depression, and manic obsession. (Tr. 60, 109). She later amended the onset date to November 29, 2004, at age thirty-seven. (Tr. 278). Ocasio was insured for disability benefits through June 30, 2005. (Tr. 19).

**Maria M. Ocasio-Alvarado v Commissioner of Social Security**  Page 4
CIVIL NO. 10-1436 (BJM)
**OPINION AND ORDER**

### *Dr. Rodríguez's Evaluations*

Ocasio was referred by the Social Security Administration ("SSA") Disability Determination Program ("DDP") for psychiatric evaluation to psychiatrist Dr. Alberto Rodríguez Robles ("Rodríguez"). (Tr. 180). Dr. Rodríguez evaluated Ocasio on May 20, 2004. (Id.). Ocasio told Dr. Rodríguez that her mental condition affected her at work, since it made her feel restless and nervous. (Tr. 181). She also reported that she underwent heart surgery as a child. (Id.). Dr. Rodríguez noted that Ocasio was nourished and well-developed, and her thoughts were "adequate, logical, coherent, and relevant." (Tr. 182). Her thought-content showed worry due to ideas of self-deprecation and fear of being away from her children, but Ocasio had no suicidal thoughts. (Id.). She looked apprehensive and anxious during the interview. (Id.). Dr. Rodríguez found that she had diminished attention and concentration and was easily distracted, but was oriented in three spheres. (Id.). Based on the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition ("DSM IV"), Dr. Rodríguez provided a diagnosis of 309.21 (separation anxiety disorder) and gave a prognosis of "poor." (Id.)

Dr. Rodríguez saw Ocasio again on January 18, 2005. (Tr. 172). Regarding Ocasio's mental state, he noted that Ocasio was withdrawn and depressive. (Tr. 174). He found that while Ocasio's thought content showed "worry due to self-deprecating ideas, despair, hopelessness, and fear to be away from her children," her thoughts were slow, logical, coherent, and relevant. (Id.). He noted that Ocasio did not have suicidal thoughts, but exhibited diminished attention and concentration. (Id.). He found that Ocasio was easily distracted, but oriented in three spheres. (Id.). Based on the DSM IV, Dr. Rodríguez provided a diagnosis of 309.21 (separation anxiety disorder) and 296.23 (major depressive affective disorder single episode severe degree without psychotic behavior). (Tr. 175). He gave a prognosis of "poor." (Id.).

On May 23, 2007, nearly two years after Ocasio's last insured date, Dr. Rodríguez completed a new mental impairment RFC. (Tr. 204-07). He marked a checklist identifying Ocasio's signs and symptoms, but did not include any supplemental descriptions of her impairments. (Tr. 204). He marked anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with

weight change, decreased energy, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, psychomotor agitation or retardation, persistent disturbances of mood or affect, apprehensive expectation, emotional withdrawal or isolation, motor tension, emotional liability, vigilance and scanning, easy distractibility, autonomic hyperactivity, and sleep disturbance. (Id.). Based on the DSM IV, Dr. Rodríguez provided a diagnosis of 309.21 (separation anxiety disorder), 296.23 (major depressive affective disorder single episode severe degree without psychotic behavior), 300.02 (generalized anxiety disorder), with a rule out of 300.3 (obsessive compulsive disorder). (Tr. 205). He gave a prognosis of "very poor." (Id.).

Dr. Rodríguez marked that Ocasio's impairments markedly limited her ability to remember work-like procedures; understand, remember, and carry out very short, simple, or detailed instructions; maintain attention and concentration for extended periods; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in a routine work setting; and be aware of normal hazards and take appropriate precautions. (Id.). Dr. Rodríguez found that Ocasio's impairments extremely limited her ability to work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without unduly distracting them or exhibiting behavior extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; deal with normal work stress; and set realistic goals or make plans independently of others. (Tr. 207). He anticipated that Ocasio's impairments would cause her to be absent from work more than four days per month. (Id.). He noted that Ocasio could not manage benefits in her own best interest. (Tr. 208).

**Maria M. Ocasio-Alvarado v Commissioner of Social Security**                                  Page 6
CIVIL NO. 10-1436 (BJM)
**OPINION AND ORDER**

### *EVALUATIONS OF THE MIGRANT HEALTH CENTER*

On July 10, 2004, Dr. Carmen N. Piñeiro, clinical psychologist, completed a Psychiatric Review Technique Form ("PRTF") regarding Ocasio's mental condition. (Tr. 147). She found the presence of a medically determinable impairment, namely an "adjustment disorder" marked by nervousness. (Tr. 153). Dr. Piñeiro noted mild restriction of activities of daily living; mild difficulty in maintaining social functioning; mild difficulty in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 158). She further found that Ocasio's anxiety-related impairment was not severe. (Tr. 148). Dr. Luis F. Umpierre Vela (Umpierre), a clinical psychologist from the DDP, reviewed and affirmed the PRTF on January 31, 2005. (Tr. 160).

On February 11, 2005, Dr. Umpierre completed a mental RFC assessment. (Tr. 186-88). He noted that Ocasio suffered from depression. (Tr. 188). The RFC assessment concluded that Ocasio was moderately limited in her ability to remember locations and work-like procedures; understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and travel to unfamiliar places or use public transportation. (Tr. 186-88). The RFC assessment concluded that Ocasio was not significantly limited in her ability to understand and remember very short and simple instructions; carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently

of others. (Id.).

Dr. Umpierre found that Ocasio had a major depressive disorder, and noted sleep problems and low self-esteem. (Tr. 193). He found that Ocasio had a moderate degree of limitation regarding restriction of activities of daily living, difficulties in maintaining daily functioning, and difficulties in maintaining concentration, persistence, or pace. (Tr. 200). He found no episodes of decompensation. (Id.).

On July 27, 2004, Dr. Angel Guerra, a psychiatrist, conducted a psychiatric evaluation of Ocasio. (Tr. 104, 239). Dr. Guerra found that she was somewhat anxious, though logical and coherent. (Tr. 243). He noted that Ocasio suffered from separation anxiety. (Tr. 245). He evaluated her Global Assessment of Functioning score ("GAF") at seventy percent, and recommended relaxation techniques, supportive therapy, and Zoloft. (Tr. 243-44).

On August 30, 2004, Dr. Guerra noted that Ocasio tolerated the Zoloft well. (Tr. 166, 237). She felt calmer and able to control her anxiety. (Id.). Ocasio had no perceptual disturbances. (Id.). She was well groomed and logical, and exercised fair insight and judgment. (Id.). Dr. Guerra recommended supportive therapy and continuing Zoloft. (Id.).

On September 30, 2004, Dr. Guerra noted that Ocasio reported feeling less anxious overall, though she reported tension regarding her in-laws. (Tr. 164, 236). Ocasio was slightly anxious, well groomed, logical, and exercised good insight. (Id.). Dr. Guerra recommended supportive therapy and continuing Zoloft. (Id.).

On November 29, 2004, Dr. Guerra noted that Ocasio expressed nervousness and increased anxiety because she was told that the government could take her children. (Tr. 162, 235). Ocasio began a strict diet and lost 40 pounds in three months. (Id.). She said that she feels guilty if she eats outside her diet. (Id.). Dr. Guerra noted that Ocasio complained of hair loss. (Id.). She also failed to begin thyroid studies, which had been recommended by a dermatologist. (Id.). Dr. Guerra commented that Ocasio was well groomed, logical, cooperative, and responsive to internal stimuli. (Id.). He recommended supportive therapy, a thyroid profile, relaxation techniques, nutritional

**Maria M. Ocasio-Alvarado v Commissioner of Social Security**  Page 8
CIVIL NO. 10-1436 (BJM)
**OPINION AND ORDER**

counseling, and continuing Zoloft. (Id.).

On January 31, 2005, Ocasio reported to Dr. Guerra that her father suffered a heart attack. (Tr. 233). She reported that this "set her back regarding her chronic anxiety," but that overall, she found that the pharmaceuticals significantly helped. (Id.). Ocasio was well groomed and logical, with fair insight and no perceptual disturbances. (Id.). Dr. Guerra recommended supportive therapy, relaxation techniques, and increasing her dosage of Zoloft from fifty to 100 milligrams. (Id.).

On March 31, 2005, Ocasio reported anxiety related to her son. (Tr. 231). She also said that she performs "obsessive" actions, such as watering plants and buying certain detergents. (Id.). Ocasio reported that she felt more able to manage situations since she began pharmaceuticals. (Id.). Dr. Guerra noted that Ocasio was anxious, though well groomed and logical, with fair insight and no perceptual disturbances. (Id.). He recommended supportive therapy, Buspar, and continuing Zoloft, and he provided Ocasio with information regarding obsessive compulsive disorder. (Id.).

On May 2, 2005, Ocasio reported to Dr. Guerra that she had a daily "obsession" with counting calories and that she tends to "fixate on certain things." (Tr. 229). Ocasio reported that she misunderstood Dr. Guerra's instructions regarding the Buspar, and started using the pharmaceutical only a week prior to her May 2, 2005 visit. (Id.). She reported "worrisome expectations of something bad," but could not explain the reasons. (Id.). Dr. Guerra noted that Ocasio was slightly anxious, but well groomed and logical. (Id.). He further noted no perceptual disturbances and fair insight. (Id.). He recommended supportive therapy and continuing Buspar and Zoloft. (Id.).

On June 30, 2005, Dr. Guerra commented that Ocasio reported that she wished to spend more time with her children.[2] (Tr. 227). She mentioned her "obsession" with her diet and weight. (Id.). She discussed the heart surgery she had as a child. (Id.). Dr. Guerra noted that her cardio functioning was within normal limits. (Id.). He also noted that Ocasio previously had episodes of panic attacks. (Id.). Ocasio was slightly anxious, pleasant, well groomed, logical, and had fair insight with no

---

[2] June 30, 2005 was Ocasio's date last insured.

perceptual disturbances. (Id.). Dr. Guerra recommended supportive therapy, continuing Buspar and Zoloft, and orientation about balanced nutrition. (Id.).

On September 26, 2005, Ocasio reported that she had a history of anxiety "dating from her adolescent years when she used to worry a lot about her mother's health." (Tr. 225). She said that she later focused this worry on her son. (Id.). She said that she fixates on certain issues, including hygiene and cleaning. (Id.). Ocasio reported that she experiences panic-like symptoms, chest pressure, and fear. (Id.) She complained of insomnia. (Id.). Ocasio was anxious, but logical and talkative, with fair insight and no perceptual disturbances. (Id.). Dr. Guerra discussed with her the importance of complying with pharmaceutical instructions and recommended relaxation techniques, Klonopin, and continuation of Buspar and Zoloft. (Id.).

On October 27, 2005, Ocasio reported feeling calmer, though she still recognized bursts of anxiety. (Tr. 223). Ocasio was well groomed, logical, and euthymic, with no perceptual disturbances and fair insight. (Id.). Dr. Guerra recommended supportive therapy and continuation of Klonopin, Buspar, and Zoloft. (Id.). He reemphasized the importance of compliance with pharmaceutical instructions. (Id.).

On January 26, 2006, Ocasio reported that she was doing well "because Zoloft helps her a lot managing stressful situations." (Tr. 221). She reported that she had memory loss and forgetfulness. (Id.). Ocasio was pleasant, logical, well groomed, and euthymic, with no perceptual disturbances and good insight. (Id.). Dr. Guerra recommended supportive therapy, relaxation techniques, and continuation of Zoloft, Klonopin, and Buspar. (Id.).

On April 27, 2006, Ocasio reported that she was complying with pharmaceutical instructions regarding the Zoloft, but was still feeling marked anxiety. (Tr. 219). Although anxious, she was well groomed and logical, and had good insight with no perceptual disturbances or suicidal ideas. (Id.). Dr. Guerra recommended supportive therapy and continuation of Zoloft. (Id.). He increased her dosage of Buspar from ten milligrams to fifteen milligrams. (Id.).

**Maria M. Ocasio-Alvarado v Commissioner of Social Security**  Page 10
CIVIL NO. 10-1436 (BJM)
**OPINION AND ORDER**

On June 29, 2006, Ocasio reported that she was feeling better. (Tr. 217). She said that the Buspar feels "too sedating," but that she found the Klonopin helpful for recurrent episodes of intense anxiety. (Id.). She was well groomed, logical, pleasant, euthymic, and exercised fair insight. (Id.). Dr. Guerra recommended supportive therapy, continuing Zoloft, discontinuing Buspar, and restarting Klonopin. (Id.). He also recommended certain lab tests. (Id.).

On August 28, 2006, Ocasio complained of interrupted sleep and restlessness. (Tr. 215). Dr. Guerra noted that she was anxious, well groomed, and logical, with no perceptual disturbances and good insight. (Id.). He recommended supportive therapy, continuation of Zoloft and Klonopin, and Ambien for insomnia. (Id.).

On December 7, 2006, Ocasio reported compliance with her medication. (Tr. 213). She said that she still experienced anxiety, but found her medication helpful. (Id.). She was well groomed, logical, and slightly anxious, with no perceptual disturbances and fair insight. (Id.). Dr. Guerra recommended supportive therapy and continuation of Zoloft, Klonopin, and Ambien. (Id.).

Ocasio filed an application for disability insurance before the SSA on March 8, 2004. (Tr. 60-62). She alleged an inability to work since August 9, 2001, which was subsequently amended to November 29, 2004. (Tr. 110, 278). Ocasio's claim was denied initially on July 16, 2004, and upon reconsideration on February 17, 2005. (Tr. 51-53, 57-58). Her claim was denied in a subsequent hearing before an ALJ on July 10, 2007. (Tr. 11-27). Ocasio waived her right to appear and testify at this hearing. (Tr. 248). Fernando Diez, her attorney, was present. (Id.). The ALJ approved her waiver to appear, but noted that he would have preferred to interview and observe Ocasio. (Tr. 249). After consideration of written evidence and the medical testimony of Dr. Rodríguez, the ALJ found that Ocasio was not under a disability within the meaning of the SSA from August 9, 2001 through June 30, 2005, the date last insured. (Tr. 17). The Appeals Council denied review of the ALJ's decision on April 4, 2010. (Tr. 3-8).

The ALJ issued his ruling on July 10, 2007. (Tr. 17-27). With regard to the five-step evaluation process, the ALJ found that Ocasio had met her burden on steps one through four. (Tr. 17-26). As to step five, the ALJ found that Ocasio was capable of performing work that existed in significant numbers in the national economy, including such representative occupations as addresser, router, and office helper. (Tr. 26). Specifically, the ALJ determined that: (1) Ocasio last met the insured status requirements of the SSA on June 30, 2005; (2) Ocasio did not engage in substantial gainful activity since the alleged onset of disability; (3) Ocasio's major depressive disorder and generalized anxiety disorder were "severe"; (4) Ocasio's combination of impairments did not meet or medically equal one of the listed impairments in Appendix 1 of the regulations; (5) Ocasio was unable to perform her past relevant work; but (6) based on her age, work experience, education, and RFC, there were jobs in significant numbers in the national economy that Ocasio could have performed. (Tr. 19-26).

The ALJ found that Dr. Guerra's progress notes from July 27, 2004, through June 30, 2005, established that Ocasio had "marked anxiety, expressed by excessive worry about the possibility of losing her children and the desire of being with them constantly." (Tr. 19-20). He found that May and June 2005 progress notes provided a diagnostic impression of generalized anxiety disorder, but noted that signs of a panic disorder were not present through the date last insured. (Tr. 20). He credited Dr. Guerra's identification of Ocasio's main problem as separation anxiety. (Id.). The ALJ further credited Dr. Guerra's progress notes indicating that Ocasio was "logical, coherent, cooperative, relevant, and well oriented in the three spheres, without perceptual disturbances or significant impairment of thought processes and content, or of insight and judgment." (Tr. 20).

The ALJ credited Dr. Rodríguez's consultative psychiatric evaluation conducted on May 20, 2004, which states that Ocasio appeared "anxious and apprehensive," but was nonetheless "logical, coherent, and relevant," and that she did not present any thought disturbances or suicidal ideas. (Tr. 20). The ALJ noted that Dr. Rodríguez diagnosed Ocasio as suffering from a separation anxiety

disorder. (Id.). He further credited Dr. Rodríguez's January 18, 2005 addition of a diagnostic impression of "severe single-episode major depressive disorder." Nonetheless, the ALJ noted that Dr. Rodríguez found that Ocasio remained "logical, coherent, relevant and well oriented in the three spheres, without thought disturbances or suicidal ideas." (Id.).

The ALJ stated that at the June 7, 2007 hearing, Dr. Rodríguez used a "checklist of signs and symptoms with spaces for diagnosis, description of treatment and prognosis, and spaces to mark mental ability to perform work-related activities and to check out functional limitations," which Dr. Rodríguez had previously completed on May 23, 2007. (Tr. 20). The ALJ stated that "by means of check marks," Dr. Rodríguez indicated that Ocasio was "extremely limited" in the specific categories of sustained concentration and persistence, social interaction and adaptation." (Id.). The ALJ noted, however, that there was no indication of sustained visits to Dr. Rodríguez between May 20, 2004 and May 22, 2007. (Id.).

At the hearing, Dr. Rodríguez testified that Ocasio suffered from a severe depressive disorder, separation anxiety disorder, and severe generalized solemnity. (Tr. 251). He urged consideration of an obsessive compulsive disorder. (Id.). He stated that Ocasio has "marked restriction of daily activities, marked difficulty in maintaining social functioning, marked difficulty in maintaining cooperation, and she has had three or more episodes of decompensation of extended duration." (Tr. 258). He testified that Ocasio's prognosis is poor. (Id.). Regarding Ocasio's ability to work, Dr. Rodríguez said that "her capacity for attention, concentration, completing the task, responding quantitative and qualitatively in the work setting will be affected." (Tr. 270).

The ALJ stated that an absence of progress notes from Dr. Rodríguez's treatment deprives the ALJ from analyzing "the pattern of said treatment and its effect on [Ocasio's] daily living and capacity to perform work-related activities at the different interviews, which were only two." (Tr. 21). The ALJ found that the mental assessment formulated by Dr. Rodríguez "is not supported by the psychiatrist's own medical findings, nor by those on the whole record." (Id.). The ALJ found Dr.

Rodríguez's testimony too speculative, as Dr. Rodríguez did not treat Ocasio on a continuing basis. (Id.). The ALJ held that at least part of Dr. Rodríguez's opinion was not supported by the record. (Id.). First, the ALJ noted that Dr. Rodríguez testified that Ocasio suffered from recurrent obsessions, but then conceded that "obsession" did not appear in the medical reports. (Tr. 22, 259). Next, the ALJ noted that Dr. Rodríguez testified that he believed Ocasio suffered from anorexia, but Dr. Rodríguez conceded that there was no diagnosis of anorexia in the record. (Tr. 22, 264). Finally, the ALJ noted that Dr. Rodríguez testified that Ocasio "met the Listing's severity requirements since November 29, 2004." (Tr. 22). However, Dr. Rodríguez did not see Ocasio "on or near that date." (Id.). The ALJ further stated that "a review of Dr. Rodríguez's evaluation reports does not support his testimony. It is noted that his reports are very cursory and lack narrative." (Id.).

The ALJ stated that his analysis in terms of treatment is limited to the progress notes from the Migrant Health Center. (Id.). He found that Dr. Guerra's GAF score of seventy is indicative of some mild symptoms or some difficulty in social, occupational, or school functioning. (Id.). He said that it is reasonable to infer that the GAF could improve or remain at the same level, rather than decrease, following treatment. (Id.). Regarding the "B" criteria of Section 12.04 of the Listing of Impairments ("Listing"), the ALJ found that "specialists stated that the claimant's daily activities were moderately restricted, she had moderate difficulties in maintaining social functioning and presented moderate difficulties in maintaining concentration, persistence and pace, without episodes of deterioration or decomposition in work and work-like settings." (Id.). The ALJ found, based on an RFC assessment by Dr. Umpierre, that Ocasio has the RFC to "understand, remember and carry out simple instructions, adapt to normal work changes, relate to others on regular terms, and maintain concentration for two hours without interruption." (Tr. 22).

Ocasio alleged that she was unable to work due to "sadness, tension, insomnia, tiredness, and forgetfulness." (Tr. 25). The ALJ found that the evidence established "the presence of medical impairments which could reasonably be expected to cause the symptoms alleged, but not to the extent

claimed." (Id.). He found that Ocasio's symptoms are not of "such disabling frequency and intensity as to prevent her from performing . . . unskilled work activity." (Id.). She responded to treatment without adverse side effects, she did not appear distressed at interviews, she took care of personal needs, and she had adequate interpersonal relationships. (Id.). Thus, the ALJ held that Ocasio's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (Id.).

The ALJ found that the preponderance of the medical evidence on the record as a whole established that through the date last insured, Ocasio was moderately restricted in activities of daily living, had moderate difficulties in social functioning, and had moderate difficulties with regard to concentration, persistence or pace. (Tr. 23). He found that Ocasio experienced no episodes of decompensation. (Id.). Thus, he held that Ocasio was able to perform simple, unskilled work activity. (Tr. 24).

The ALJ noted that when a claimant cannot substantially perform all exertional demands of work at a given level of exertion or has non-extertional limitations, the ALJ uses the Medical-Vocational Guidelines ("Grid") "as a basis for decisionmaking." (Tr. 26). While he acknowledged that Ocasio's ability to perform work at all exertional levels was compromised by non-exertional limitations, according to vocational specialists from the DDP, she could nonetheless perform "the requirements of representative occupations such as addresser, router and office helper." (Tr. 26, 129). Relying on the determination of vocational specialists from the DDP, he held that considering Ocasio's "age, education, work experience, and residual functional capacity," Ocasio was capable of "making a successful adjustment to other work that existed in significant numbers in the national economy." (Id.). Accordingly, the ALJ held that Ocasio was not disabled from August 9, 2001 through June 30, 2005. (Id.).

## DISCUSSION

The analysis in this case centers on the ALJ's determination at step five in the sequential evaluation process contained in 20 C.F.R. § 404.1520. At that step, the ALJ used the Grid as a

framework, in addition to the opinion of vocational specialists from the DDP, for his determination that Ocasio was able to perform work that existed in the national economy. Ocasio does not contest the ALJ's findings with regard to steps one through four. Thus, the question before the court is whether the ALJ's decision at step five was based upon substantial evidence.

"[T]he Grid is based on a claimant's exertional capacity and can only be applied when claimant's non-exertional limitations do not significantly impair claimant's ability to perform at a given exertional level." Rose v. Shalala, 34 F.3d 13, 19 (1st Cir. 1994), citing Sherwin v. Sec'y of Health & Human Servs., 685 F.2d 1, 2-3 (1st Cir.1982). Where the claimant's non-exertional impairments limit her ability to perform the full range of jobs, the Commissioner must carry his burden by other means, "typically through the use of a vocational expert." Ortiz, 890 F.2d at 524. "If the issue in determining whether [claimant] is disabled is whether [claimant's] work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue," the SSA may determine whether to use a vocational expert or other specialist. 20 C.F.R. §§ 404.1566(e), 416.966(e). "[I]f a non-strength impairment, even though considered significant, has the effect only of reducing that occupational base marginally, the Grid remains highly relevant and can be relied on exclusively to yield a finding as to disability." Id.

Regarding mental impairment in particular, exclusive reliance upon the Grid is appropriate so long as the claimant's mental impairment does not "interfere more than marginally with the performance of the full range of unskilled work." Id. at 526. The procedure for evaluating a mental impairment is set forth in 20 C.F.R. § 404.1520a. Under the regulation, the ALJ's decision "must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section." 20 C.F.R. § 404.1520a(e)(2). The four functional areas in which the Commissioner must rate each claimant are: "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R.

**Maria M. Ocasio-Alvarado v Commissioner of Social Security**  
CIVIL NO. 10-1436 (BJM)  
**OPINION AND ORDER**

Page 16

§ 404.1520a(c)(3). A mental impairment may be considered "not severe" when the Commissioner rates the claimant's degree of limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area. 20 C.F.R. § 404.1520a(d)(1); see also Figueroa-Rodríguez v. Sec'y of Health & Human Servs., 845 F.2d 370, 372 (1st Cir. 1988).

Here, the ALJ found that prior to June 30, 2005, Ocasio was moderately limited in the first three functional areas and had no episodes of decompensation. (Tr. 23). The ALJ thus rated Ocasio's mental impairments as "severe." (Tr. 19). These findings accord with Dr. Umpierre's mental RFC assessment. (Tr. 186-20). They also accord with Dr. Rodríguez's May 2004 and June 2005 reports that despite Ocasio's diminished concentration, her thoughts were "logical, coherent, and relevant," and that while she felt restless and nervous at work, she had good relations with her family and coworkers. (Tr. 173-74, 181-82). These mixed indicators – some positive, some negative – of Ocasio's concentration and social functioning support a finding of "moderate" limitation. I find that substantial evidence supports the ALJ's rating of the four functional areas and his consequent finding of severe impairment.

The next question is whether the ALJ's reliance upon the Grid, in combination with the opinion of vocational specialists from the Disability Determination Service ("DDS"), was proper in light of Ocasio's severe impairment, which constitutes a significant non-exertional limitation. (Tr. 129). Here, the ALJ found that Ocasio's ability to perform work at all exertional levels was compromised by certain non-exertional limitations, thus precluding sole reliance on the Grid. (Tr. 26, 129). Ocasio argues that the ALJ erred by failing to "secure the expert opinion of a vocational expert to assess the eroding impact on plaintiff's occupational base . . . and provide particularized proof of the jobs the claimant could still perform." (Docket No. 10, p. 13-14).[3] In addition to the Grid, however, the ALJ relied on the opinion of vocational specialists at the DDS in determining the existence of jobs "in the

---

[3] While Ocasio argues that the opinion of a vocational specialist is an "inadequate substitute for the live testimony of a vocational expert," she fails to cite authority for such assertions. (Docket No. 10, p. 9-12).

**Maria M. Ocasio-Alvarado v Commissioner of Social Security**  Page 17
CIVIL NO. 10-1436 (BJM)
**OPINION AND ORDER**

national economy for an individual with the claimant's age, education, work experience, and residual functional capacity." (Tr. 26, 129). When the issue in determining whether a claimant is disabled is whether a claimant's work skills can be used in other work and the specific occupations in which they can be used, the SSA may determine whether to use a vocational expert or other specialist. 20 C.F.R. 404.1566(e), 416.966(e). Here, the ALJ relied on the opinion of vocational specialists who provided examples of jobs the claimant could still perform. (Tr. 26, 129). Accordingly, the ALJ did not err by failing to take live testimony from a vocational expert.

The ALJ found that Ocasio's conditions "are not of such disabling frequency and intensity as to prevent her from performing . . . simple, unskilled work activity." (Tr. 25). He stated that this finding was corroborated "by the nature of the claimant's psychiatric treatment, her response to said treatment without adverse side effects and by the absence of persistently disabling mental pathology." (Tr. 25). He relied on vocational specialists' opinion in considering the extent to which Ocasio's non-exertional limitations eroded the unskilled light occupational base. (Tr. 26, 129). He found that, notwithstanding his determination of her compromised ability to perform work at all exertional levels, Ocasio could "perform the requirements of representative occupations such as addresser, router and office helper." Id.

Ocasio argues that the descriptions of the three examples of alternate jobs provided by the ALJ do not accord with the residual mental capacity accepted by the ALJ. (Docket No. 10, p. 9-10). First, Ocasio argues that Dictionary of Occupational Titles (DOT) section 222.587-030 listed by the vocational specialists does not pertain to "router," but rather pertains to "mailer," which requires a Specific Vocational Preparation ("SVP") level of three – which corresponds to semi-skilled work. (Docket No. 10, p. 10; Tr. 129). The correct DOT section for "router" is 222.587-038, which has an SVP level of two, corresponding to unskilled work.[4] See Dep't of Labor, Dictionary of Occupational

---

[4] It appears that the vocational specialist made a typo in providing a DOT number of 222.587-03**0**, rather than 222.587-03**8**.

**Maria M. Ocasio-Alvarado v Commissioner of Social Security**  Page 18
CIVIL NO. 10-1436 (BJM)
**OPINION AND ORDER**

Titles, § 222.587-038 (router), (rev. 4th ed.1991); see also 20 C.F.R. §§ 404.1568, 416.968.  Next, Ocasio argues that DOT section 239.597-010, listed by the vocational specialists as the DOT section for "office helper," does not exist.  (Docket No. 10, p. 11; Tr. 129).  While Ocasio is correct that DOT section 239.597-010 does not exist, the correct DOT section for "office helper" is 239.567-010, which similarly corresponds to an SVP level of two.[5]  See Dep't of Labor, Dictionary of Occupational Titles, § 239.567–010 (office helper), (rev. 4th ed.1991).  Finally, Ocasio argues without any supporting citations that the job of "addresser," which entails a vocabulary of 5,000-6,000 words and a reading rate of 190-215 words per minute, constitutes unskilled, "but not simple," work. (Docket No. 10, p. 11).  The job of "addresser," however, corresponds to an SVP level of two, which is designated as unskilled work.  See Dep't of Labor, Dictionary of Occupational Titles, § 209.587-010 (addresser), (rev. 4th ed.1991).  Unskilled work requires "little or no judgment to do *simple* duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a) (emphasis added).  Therefore, the ALJ correctly determined that the representative occupations suggested by the vocational specialists correspond with Ocasio's RFC.  (Tr. 22, 26, 129).

Next, Ocasio argues that the "State Agency medical consultants . . . did not provided [sic] specific reasons for the opinions about the plaintiff [sic] mental residual functional capacity which showed they were grounded in the evidence on record." (Docket No. 10, p. 18).  However, the record shows that Dr. Umpierre explained his marks in Ocasio's RFC.  (Tr. 188).  He explained that "overall she retains the capacity to understand, remember, and carry out simple tasks; adjust to minor work changes; relate on simple terms with others; and maintain concentration for two-hour periods." (Tr. 188).

Plaintiff further argues that Social Security Ruling (SSR) 85-15 justifies a finding of disability (Docket No. 10, p. 20). SSR 85-15 states:

---

[5]Again, it appears that the vocational specialist made a typo in providing a DOT number of 239.5**9**7-010, rather than 239.5**6**7-010.

**Maria M. Ocasio-Alvarado v Commissioner of Social Security**  Page 19
CIVIL NO. 10-1436 (BJM)
**OPINION AND ORDER**

> Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

Importantly, Dr. Umpierre's RFC states that Ocasio was either not significantly limited or moderately limited in each of these areas. (Tr. 186-88). While the First Circuit has held that the question regarding sole reliance on the Grid in evaluating moderate limitations is a "close one," here, the ALJ supplemented his use of the Grid with documents submitted by vocational specialists of the DDS in making his determination that Ocasio could perform certain unskilled jobs despite moderate limitations in her ability to respond appropriately to supervision, coworkers, and usual work situations, and to deal with changes in a routine work setting. See Ortiz, 890 F.2d at 527; (Tr. 26, 129, 186-88).

While plaintiff's memorandum of law stresses the opinions of Dr. Rodríguez, defendant correctly points out that the ALJ is entitled to grant controlling weight to the opinion of Dr. Guerra, who saw Ocasio on a consistent basis. See 20 C.F.R. § 404.1527(d)(2)-(5); (Docket Nos. 10, p. 2-7; 20, p. 5-6). It was within the ALJ's discretion to deny controlling weight to Dr. Rodríguez's assessment, although he was a consultant who examined Ocasio on May 20, 2004 and January 18, 2005. See 20 C.F.R. § 404.1527(d)(2)-(5); Roman-Roman v. Comm'r of Soc. Sec., 114 F. App'x 410, 411-12 (1st Cir. 2004), citing Rodríguez-Pagan, 819 F.2d at 2-3; (Tr. 180, 172, 204). "[T]he responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ." Seavey v. Barnhart, 276 F.3d 1, 10 (1st Cir. 2001). Here, the ALJ dismissed Dr. Rodríguez's opinion, formulated from two examinations prior to the date last insured, as "too speculative." (Tr. 22). The ALJ additionally noted that parts of Dr. Rodríguez's testimony were not supported by the record. (Id.). Finally, after Dr. Rodríguez testified that Ocasio met the Listings severity requirements since November 29, 2004, the ALJ stated

that "it escapes reason how the physician could establish . . . such a precise date without having seen her on or near that time." (Id.). It was within the discretion of the ALJ to instead rely on the RFC from Dr. Umpierre and six progress notes from Dr. Guerra, the treating psychiatrist who saw Ocasio on a consistent basis, in his decision to negate Ocasio's argument that she was disabled prior to the date last insured. (Tr. 22).

In light of the evidence discussed above, I find that the ALJ's conclusion is supported by the substantial evidence of record. Ocasio's mental restraints may preclude sole reliance on the Grid, but the ALJ relied on the opinion of vocational specialists from the DDS in determining that Ocasio was capable of "making a successful adjustment to other work the existed in significant numbers in the national economy." See Román-Román, 114 F. App'x at 412; (Tr. 26, 129).

## CONCLUSION

For the reasons stated above, the Commissioner's decision is **AFFIRMED**. Judgment shall be entered accordingly.

**IT IS SO ORDERED**.

At San Juan, Puerto Rico, on this 10th day of June, 2011.

                         *S/ Bruce J. McGiverin*
                         BRUCE J. McGIVERIN
                         United States Magistrate Judge